ORIGINAL

22 MAG 8103

Approved: Vlad Vainberg
Vladislav Vainberg
Assistant United States Attorney

Joe McFarlane
Joseph McFarlane, Trial Attorney, Criminal Division

Before: THE HONORABLE GABRIEL W. GORENSTEIN
United States Magistrate Judge
Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | SEALED COMPLAINT |
| - v. - | Violations of 18 U.S.C. § § 2, 371, 1956, 15 U.S.C. § 78dd-2 |
| CHARLES FINKEL, Defendant. | COUNTY OF OFFENSE: NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

RYAN CASSIDY, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

**COUNT ONE**
(Conspiracy to Violate the Foreign Corrupt Practices Act)

1. From at least in or about 2008 through at least in or about 2016, in the Southern District of New York and elsewhere, CHARLES FINKEL, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Title 15, United States Code, Section 78dd-2(a).

2. It was a part and an object of the conspiracy that CHARLES FINKEL, the defendant, and others known and unknown, being a domestic concern and an officer, director, employee, and agent of a domestic concern and a stockholder thereof acting on behalf of such domestic concern, would and did willfully and corruptly make

use of the mails and a means and instrumentality of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offered, gifted, promised to give, and authorized the giving of a thing of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be offered, given, and promised, directly and indirectly, to a foreign official for purposes of: (A)(i) influencing an act and decision of such foreign official in his official capacity; (ii) inducing such foreign official, to do and omit to do an act in violation of the lawful duty of such official; (iii) securing any improper advantage; and (B) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence any act and decision of such government and agencies and instrumentalities, in violation of Title 15, United States Code, Section 78dd-2(a), to wit, FINKEL agreed to pay and offer money and other things of value to foreign officials in Brazil, including an official of the Receita Federal of Brazil ("RFB")("Official-1") to obtain and retain business, secure an improper advantage, and direct business to a Swiss company (together with its subsidiaries and affiliates, "Company-1)" and others.

Overt Acts

3. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a. On or about December 18, 2008, the Casa da Moeda do Brasil (the "CMB"), a department or agency of the Brazilian government, entered into a five-year contract (the "2008 Contract") with a Brazilian subsidiary of Company-1 ("Subsidiary-1"), worth approximately $1.4 billion. Pursuant to the 2008 Contract, Subsidiary-1 pledged to implement and service a system to track and tax beverages for the Brazilian government called "SICOBE." The 2008 Contract was signed by, among others, CHARLES FINKEL, the defendant, on behalf of Subsidiary-1.

b. As discussed in detail below, Official-1, an official of the RFB, participated in the selection of Subsidiary-1 for the 2008 Contract, and, following the expiration of that contract, in or about 2014 and 2015, helped rig the bidding process for the renewal of that contract in Subsidiary-1's favor.

c. In or about 2009, the wife of Official 1 ("CC-1") incorporated a company identified as a consulting company

("Consulting Company-1").

d. On or about June 12, 2009, FINKEL entered into a contract (the "Finkel Contract") in New York, New York, on behalf of a company ("Finkel Company-1") with Consulting Company-1, which provided, among other things, that Consulting Company-1 would provide purported consulting services to Finkel Company-1, and designated a specific financial institution headquartered in New York, New York ("Bank-1") to be used for payments from Finkel Company-1 to Consulting Company-1.

e. On or about December 4, 2009, Finkel Company-1 received a wire from Company-1 in the approximate amount of $2,373,789.46 with the payment detail "COMMISSION SICOBE+SCORPIOS". The wire was deposited to a bank account of Finkel Company-1 ("Finkel Company-1 Account") at Bank-1. On or about December 7, 2009, Finkel Company-1 sent approximately $125,000 from Finkel Company-1 Account to Consulting Company-1.

f. On June 5, 2015, Finkel Company-1 Account received a wire from Company-1 in the amount of approximately $2,357,253.06. On or about the same day, Finkel Company-1 Account sent approximately $177,000 to Consulting Company-1.

(Title 18, United States Code, Section 371.)

**COUNT TWO**

(Violation of the Foreign Corrupt Practices Act: Domestic Concern)

4. From at least in or about 2008 through at least in or about 2016, in the Southern District of New York and elsewhere, CHARLES FINKEL, the defendant, being a domestic concern and an officer, director, employee, and agent of a domestic concern and a stockholder thereof acting on behalf of such domestic concern, would and did willfully and corruptly make use of the mails and a means and instrumentality of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offered, gifted, promised to give, and authorized the giving of a thing of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be offered, given, and promised, directly and indirectly, to a foreign official for purposes of: (A)(i) influencing an act and decision of such foreign official in his official capacity; (ii) inducing such foreign official, to do and omit to do an act in violation of the lawful duty of such official; (iii) securing any improper advantage; and (B) inducing such foreign official to use his, her or its influence with a foreign

government and agencies and instrumentalities thereof to affect and influence any act and decision of such government and agencies and instrumentalities, in violation of Title 15, United States Code, Section 78dd-2(a), to wit, FINKEL paid and offered money and other things of value to foreign officials in Brazil, including Official-1, to obtain and retain business, secure an improper advantage, and direct business to Company-1, its subsidiaries, and others.

(Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(g)(2)(A);
Title 18, United States Code, Section 2.)

**COUNT THREE**

(Conspiracy to Commit Money Laundering)

5. From at least in or about 2009 through at least in or about June 2015, in the Southern District of New York and elsewhere, CHARLES FINKEL, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1956(a)(2)(A).

6. It was a part and an object of the conspiracy that CHARLES FINKEL, the defendant, and others known and unknown, would and did knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside of the United States and to a place in the United States from and through a place outside of the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, (a) a violation of the Foreign Corrupt Practices Act, as charged in Counts One and Two of this Complaint, and (b) an offense against a foreign nation (Brazil) involving bribery of a public official and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), in violation of Title 18, United States Code, Section 1956(a)(2)(A), to wit, FINKEL agreed to transmit and cause to be transmitted funds from Switzerland to and through the United States, and from the United States to foreign countries, in furtherance of a scheme to pay and offer money and other things of value to foreign officials in Brazil and elsewhere, including Official-1, to obtain and retain business, secure an improper advantage, and direct business to Company-1, its subsidiaries, and others.

(Title 18, United States Code, Section 1956(h).)

**COUNT FOUR**
(Money Laundering)

7. From at least in or about 2009 through at least in or about June 2015, in the Southern District of New York and elsewhere, CHARLES FINKEL, the defendant, knowingly transported, transmitted, and transferred, attempted to transport, transmit, and transfer, and aided and abetted and caused the transport, transmission, and transfer of, a monetary instrument and funds from a place in the United States to and through a place outside of the United States and to a place in the United States from and through a place outside of the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, (a) a violation of the Foreign Corrupt Practices Act, as charged in Counts One and Two of this Complaint, and (b) an offense against a foreign nation (Brazil) involving bribery of a public official and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), in violation of Title 18, United States Code, Section 1956(a)(2)(A), to wit, FINKEL transmitted, aided and abetted, and caused to be transmitted funds from Switzerland to and through the United States, and from the United States to foreign countries, in furtherance of a scheme to pay and offer money and other things of value to foreign officials in Brazil and elsewhere, including Official-1, to obtain and retain business, secure an improper advantage, and direct business to Company-1, its subsidiaries, and others.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

8. I have been a Special Agent with the FBI for approximately five years and am one of the law enforcement agents with primary responsibility for this investigation.

9. As part of my work at the FBI, I have received training regarding corruption and white collar crimes. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by representatives of the Ministerio Publico Federal of Brazil (Brazil's federal prosecution agency) pursuant to a mutual legal assistance treaty, documents provided by

financial institutions, court records from Brazil, including the guilty verdict and bench opinion issued on or about May 16, 2019, by Brazilian Federal Court Judge Valeria Caldi Magalhaes adjudging CHARLES FINKEL, the defendant, Official-1, and CC-1 guilty of bribery-related charges related to the scheme described in this Complaint (the "Verdict"), my examination of documents and reports by others, my interviews of witnesses, and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where dates, figures, and calculations are set forth herein, they are approximate.[1]

## OVERVIEW

10. This case involves a bribery scheme to pay, among others, a Brazilian official (Official-1) in exchange for lucrative business and business advantages with the Brazilian government. During portions of the relevant time period, CHARLES FINKEL, the defendant, was an executive vice president of Subsidiary-1, a subsidiary of Company-1, and the owner of his own consulting firm, Finkel Company-1, which received over $292 million in payments from Company-1 and its subsidiaries and affiliates. During the course of the scheme, FINKEL paid bribes of over $14 million to Official-1 and Official-1's wife (CC-1) in order to corruptly obtain and retain contracts worth over $1 billion between Subsidiary-1 and the Brazilian Mint, referred to as the CMB. The vehicle for paying the bribes to Official-1 was a purported consulting company (i.e., Consulting Company-1) set up in the name of Official-1's wife. FINKEL furthered the scheme while present in New York, New York, among other places, and caused wire transfers in furtherance of the scheme to be sent from New York, New York to Brazil.[2]

---

[1] Where emails and other documents are quoted herein, the quotations are generally verbatim, with alterations denoted with brackets and ellipses, as appropriate. Further, as noted herein, where documents were written in Portuguese, I have reviewed -- and, as appropriate, quoted from -- draft translations of such documents. All references to intercepted calls are to draft translated transcripts of such calls that I have reviewed. All such draft translations are subject to revision.

[2] The Government has obtained court orders pursuant to 18 U.S.C. § 3292 that suspended the statute of limitations based on the

## THE DEFENDANT AND RELEVANT ENTITIES AND INDIVIDUALS

11. Based on my review of documents obtained from Brazil, the State of New York, financial institutions, and publicly available information, I know the following, in substance and in part:

a. CHARLES FINKEL, the defendant, is a citizen of the United States and Brazil, who has principally resided in New York, New York from at least in or about June 2009 through the present. During the relevant time period, FINKEL was an executive vice president of Subsidiary-1 and the owner of Finkel Company-1, an entity based in New York City. FINKEL was a "domestic concern," and an officer, director, employee, and agent of a "domestic concern," and a stockholder thereof acting on behalf of a "domestic concern," as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h).

b. Official-1, an individual whose identity is known to the United States, is a citizen of Brazil. At all relevant times, Official-1 was an auditor and senior official at the RFB, which is the Brazilian Federal Revenue Service and is a department or agency of the Brazilian government. Official-1 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

c. During the relevant time period, CC-1, an individual whose identity is known to the United States, was the wife of Official-1, and a Brazilian citizen. According to records obtained from Brazil, CC-1 was the beneficial owner of Consulting Company-1.

d. According to records obtained from Brazil and other bank records, a close relative of FINKEL ("CC-2"), an individual whose identity is known to the United States, processed invoices and sent payments and confirmations of services purportedly provided by Consulting Company-1 to Finkel Company-1.

e. The CMB was a department and agency of the Brazilian government that was responsible for, among other things, producing legal tender, bank notes, and other security prints for authorized items issued by government entities, like passports.

f. Company-1, the identity of which is known to the United States, was a Swiss company that produced security inks for currencies and sensitive documents, including identity documents,

---

Government's requests for evidence to certain foreign countries. In total, pursuant to these orders, the statute of limitations has been suspended for three years.

passports, and lottery tickets. Company-1 and its subsidiaries also provided products and services to governments that allowed for the tracing of products for tax purposes.

g. Subsidiary-1, the identity of which is known to the United States, was a Brazilian subsidiary of Company-1. During portions of the relevant time period, FINKEL was an executive vice president of Subsidiary-1.

h. Finkel Company-1, the identity of which is known to the United States, was an entity based in New York, New York, incorporated in 1999. Based on my review of bank records, I know that Finkel Company-1 established the "Finkel Company-1 Account" at Bank-1 and that FINKEL and CC-2 were owners and signatories of the Finkel Company-1 Account.

i. Consulting Company-1, the identity of which is known to the United States, was a Brazilian entity established in 2009 that was owned by CC-1.

THE 2008 CONTRACT BETWEEN CMB AND SUBSIDIARY-1

12. Based on records obtained from Brazilian authorities, I have learned the following about a contract entered between the CMB and Subsidiary-1 in or about December 2008:

a. In or around early 2008, the CMB began the process of seeking bids for a contract for the implementation of a system for tracking and identifying cold beverages, such as beer and soda, called "SICOBE," for the purpose of ensuring that the Brazilian government adequately taxed these products.

b. This process was initiated by Official-1. In or about March 2008, Official-1 sent a signed letter to the President of the CMB requesting that the CMB conduct a study on the implementation of a program for cold beverages that would allow the beverages to be tracked and taxed by the RFB.

c. Because the RFB is responsible for collecting taxes in Brazil, the RFB had influence over any system established by the CMB regarding tax collection. Official-1, as a senior auditor, in turn had influence over the process.

d. According to CMB meeting minutes, on or about July 3, 2008, a meeting was held to discuss RFB's request for CMB to develop a cold beverage tracking system. The meeting was attended by, among others, senior representatives of RFB, including Official-1, and – prior to any bidding even being opened for SICOBE

— representatives of Subsidiary-1, including CHARLES FINKEL, the defendant, and a Subsidiary-1 engineer ("Employee-1"). At the meeting, Official-1 expressed RFB's satisfaction with the results obtained by SCORPIOS, a system serviced by Subsidiary-1 since 2007 for CMB that allowed individual cigarette packages to be identified and controlled.

e. In or about July 2008, Official-1 recommended that CMB officials travel to Turkey to review a system in place there that was similar to SCORPIOS and was operated by Company-1, the parent of Subsidiary-1. Several CMB employees then travelled to Company-1 facilities in Turkey and Switzerland and produced a report, concluding, in part and substance, that the system already in place in Brazil, called SCORPIOS, had all technical and operational conditions necessary to allow for an expansion to cover cold beverage control.

f. On or about August 21, 2008, Official-1 sent a letter to the President of the CMB, stating that the planned SICOBE beverage tracking system should meet the requirements of the SCORPIOS system used to track tobacco products in Brazil, already operated by Subsidiary-1. In the same letter, Official-1 recommended that the CMB hire Subsidiary-1 to implement the SICOBE beverage tracking system.

g. According to a CMB memorandum issued on or about December 9, 2008, CMB waived the bidding process for the hiring of Subsidiary-1. The memorandum stated, in part, that through a notice dated November 27, 2008, RFB had approved SICOBE in full, and that SICOBE would use the platform already in use by the SCORPIOS System. The memorandum further stated, in part and substance, that to date, only Subsidiary-1 was qualified and had the technical expertise to provide the security solution appropriate to rendering the service.

h. On or about December 18, 2008, Subsidiary-1 entered into the 2008 Contract with the CMB to provide services for SICOBE). Based on my review of the 2008 Contract, I know that the 2008 Contract was for a duration of five years and listed its estimated total value as Brazilian Real 3,391,500,000.00, which was approximately $1.431 billion at the then-prevailing exchange rate. FINKEL signed the 2008 Contract as a representative on behalf of Subsidiary-1.

## THE BIDDING PROCESS FOR SICOBE AFTER THE EXPIRATION OF THE 2008 CONTRACT

13. Based on my review of records and reports obtained from

Brazil, translated transcripts of calls intercepted by Brazilian law enforcement between and among CHARLES FINKEL, the defendant, Official-1, and Employee-1, and others, I have learned the following, in part and substance, about the bidding process for SICOBE-related services after the expiration of the 2008 Contract:

a. When the 2008 contract expired in 2013, CMB retained Subsidiary-1 to continue providing SICOBE-related services for 36 months, running through December 2016, pursuant to a waiver statement issued on or about December 10, 2013. The waiver statement allowed the CMB to renew the contract with Subsidiary-1 without going through a formal bidding process.

b. Notwithstanding that extension, CMB opened the bidding process for an additional, expanded contract that would include services related to packaging and trademark control.

c. After a pre-qualification process, Subsidiary-1 and one other company, referred to herein as "Competitor-1," were authorized to carry out a test of their services on a production line.

d. Official-1 was a member of the technical commission, consisting of representatives from RFB and CMB, that assessed the qualified companies (the "Commission"). The Commission assessed Subsidiary-1 and Competitor-1, and cleared both for the second stage of the process.

e. After the Commission cleared Competitor-1, Subsidiary-1 filed an administrative appeal challenging that decision.

f. Based on my review of translations of intercepted calls involving FINKEL and others obtained by Brazilian authorities pursuant to Brazilian legal process, as well as other records and reports obtained from Brazilian authorities, I have learned that FINKEL and others at Subsidiary-1 referred to Official-1 by a code name.

g. Based on my review of an intercepted phone call between Official-1 and Employee-1 on or about April 8, 2014 (the "April 8 Call"), I have learned that Official-1 provided Subsidiary-1 with information about the internal deliberations of the Commission and Competitor-1's bid and its supposed weak points. Official-1 also guided Employee-1 on which arguments to pursue in Subsidiary-1's administrative appeal against Competitor-1.

i. For example, Employee-1 opened the April 8 Call

by noting that he was "preparing [him]self psychologically for the hearing tomorrow" and asked if Official-1 could clarify some things.

ii. During the course of the ensuing technical discussion about Subsidiary-1 and Competitor-1's respective bids, Official-1 provided the following advice and suggestions, among others, on how to best position the bid and qualifications of Subsidiary-1 and how to identify weaknesses in the bid of Competitor-1 when submitting the administrative appeal:

> Official-1: Then, they [i.e., Competitor-1] are [sic] two points that were lame. And they are SICOBE's two key points, you understand?
>
> Employee-1: Right.
>
> Official-1: That is, SICOBE requires you to do the authentication by means of a scanner.
>
> Employee-1: But what was the other point? I don't understand.
>
> Official-1: And the brand identification was also lame.
>
> Employee-1: Oh, that was also lame.
>
> Official-1: You understand? There are two points that were lame: brand identification and authentication.

h. Based on my review of reports and records obtained from Brazil, I have learned that Subsidiary-1's administrative challenge against Competitor-1 was denied.

i. Based on my review of a translation of an intercepted phone call between Official-1 and Employee-1 on or about May 20, 2014 (the "May 20 Call"), I have learned that Official-1 suggested to Employee-1 that Subsidiary-1 immediately file a lawsuit against the CMB, the entity whose interests Official-1 was supposedly promoting as a member of the Commission, challenging the denial of Subsidiary-1's administrative appeal. The May 20 Call included the following exchange, in part and substance:

> Employee-1: Because we are, that is, the line isn't going in with anything now, no . . .].
>
> Official-1: I think it's wrong. I think it's wrong.

Employee-1: You have to go in now[?]

Official-1: I think.

Employee-1: Go in now.

Official-1: [individual referred to as "Individual-2"] and I, but we can't talk about that here . . . . Question of the *timing* . . . question of the timing, understand. Don't lose the *timing*.

j. Based on my review of translations of intercepted calls, I have learned that later on or about the same day, FINKEL discussed with Employee-1 filing a lawsuit to force Competitor-1 to conduct a pilot test, which requirement had been previously waived by the CMB. FINKEL also emphasized the importance of having Official-1 be one of the members of the commission that would evaluate such a pilot test.

k. Based on my review of an intercepted phone call between FINKEL AND Employee-1 on or about July 17, 2014 (the "July 17 Call"), as well as other reports and records, I have learned that FINKEL, Official-1, and Employee-1 caused Subsidiary-1 to create a pilot test script that would be adopted by the Brazilian Mint through Official-1's influence. The pilot script set forth the parameters of a practical test that both Subsidiary-1 and Competitor-1 would have to undertake on production lines located at a beverage plant to evaluate their technical capacity to provide SICOBE services. The pilot script created by Subsidiary-1 for adoption by CMB was intentionally designed to favor Subsidiary-1's own capacities and to cause Competitor-1 to fail. For example, FINKEL and Employee-1 made the following statements, among others, on the July 17 Call:

FINKEL: Did you test it [i.e., the script]?

Employee-1: I tested it. So, it's a huge difference from one script to the other. Since that was not defined in the call for bids . . .

Employee-1: No! We're going to propose a script that doesn't exist.

FINKEL: Ah, Okay.

Employee-1: You understand?

FINKEL: Okay.

Employee-1: It doesn't exist, and that script is going to have to be extremely tight.

FINKEL: Perfect! That helps for fucking it up, right, [Employee-1]?

Employee-1: No. That defines the game. That defines the game, that defines the game. Then, I'm telling you: [Competitor-1] won't pass, you understand?

. . .

FINKEL: And when is it that you are going to finish the script,[Employee-1]?

Employee-1: Today, tomorrow, tomorrow I'm sending it. Tomorrow I'm sending it?

FINKEL: Are you sending it to me? Send it to the one [unintelligible]

Employee-1: I send it, I'll send it in advance. I didn't speak with [Official-1] yet about that, okay? It's, I don't believe he's going to object, on the contrary . . . and

FINKEL: No, he's going to be in favor.

l. Based on my review of intercepted calls on July 18, 2014 and August 13, 2014, as well as other reports and records, I know that Official-1 and Employee-1 periodically discussed how to design a script that would be difficult for Competitor-1 to pass.

m. Based on my review of an intercepted phone call on or about August 15, 2014 (the "August 15 Call"), as well as other reports and records, I know that FINKEL advised Employee-1 that Official-1 informed FINKEL that the script secretly created by Subsidiary-1 would be adopted by the CMB. FINKEL also stated that Official-1 solicited FINKEL's view as to whether the script should be withheld from Competitor-1 until the test occurred so that Competitor-1 would be unable to prepare for the test. FINKEL and Employee-1 discussed the risk associated with that strategy, including Competitor-1's likely response upon being ambushed with the script, and the fact that the script could be traced back to Employee-1. The August 15 Call included the following exchange, in part and substance:

FINKEL: Listen, I just finished a phone call with [Official-1].

Employee-1: Right, right.

. . .

FINKEL: And he sent me a messages saying this: ["]I just 100% confirmed the script done by [Employee-1]["]

n. Based on my review of records obtained from Brazil, including a disqualification order signed by Official-1 as auditor-inspector of RFB and other officials at CMB, I learned that the Technical Assessment Commission deemed Competitor-1 to have failed the pilot test, which took place on or about January 5 and 6, 2015.

o. Based on my review of intercepted calls on January 5, 2015, as well as other reports and records, FINKEL and Employee-1 discussed how Official-1 had assisted Subsidiary-1 in passing the pilot test and in ensuring that Competitor-1 failed the pilot test. For example, on an intercepted call on January 5, 2015, FINKEL told Employee-1 that Official-1 was going to explain to his colleagues that the technology of Competitor-1 had "no innovation" and was "a system based on ours."

p. According to documents obtained from Brazil, I have learned the following about the termination of the SICOBE bidding process, in part and substance:

i. On or about January 21, 2015, Competitor-1 filed an administrative appeal, which was dismissed by CMB.

ii. Competitor-1 then filed litigation in the Brazilian court system and obtained a preliminary injunction of the bidding process. CMB subsequently cancelled the bidding process.

iii. However, as noted above, Subsidiary-1 had been awarded a 36-month contract extension in December 2013, pursuant to a waiver of the bidding process. As a result, Subsidiary-1 continued providing services for SICOBE until December 2016.

iv. Subsidiary-1 continued receiving payments from the CMB pursuant to the contract through December 2016.

PAYMENTS IN FURTHERANCE OF THE SCHEME

14. Based on my participation in this investigation and review of bank records and other documents provided by Brazilian authorities, I have learned the following:

a. On or about April 23, 2009, less than five months after CMB and Subsidiary-1 entered into the 2008 Contract, CC-1 incorporated Consulting Company-1 in Brazil as a majority member.

b. On or about June 12, 2009, less than two months after Consulting Company-1 was established, it entered into a purported consulting contract (the "Finkel Contract") with Finkel Company-1.

c. The Finkel Contract is dated June 12, 2009, in New York, New York. It is signed by CHARLES FINKEL, the defendant, on behalf of Finkel Company-1, and by CC-1, the wife of Official-1, on behalf of Consulting Company-1.

d. The Finkel Contract recites that Finkel Company-1 is headquartered at a specified address in New York, New York.

e. The Finkel Contract incorporates a work proposal dated April 20, 2009 (the "Proposal"), from Consulting Company-1. The attached proposal, authored by CC-1 as "executive director," states that Consulting Company-1 is "an innovative company, whose mission is to strive for the sustainability of your company's activities, based on the balanced satisfaction of all parties interested in the business management of your activities: shareholders, clients, associates, suppliers, company, and partners." According to the Proposal, Consulting Company-1 offered consulting services in the fields of "skills management," "career plan development," "development of strategic remuneration," introducing the Japanese "five-senses" or 5S concept, "process management," and "recruiting and selection." The Proposal further states that the consulting period would be for five years from the date of signing of the Finkel Contract, which is the same time period and would overlap substantially with the 2008 Contract entered into only months earlier between CMB and Subsidiary-1. The Proposal does not provide any pricing, cost metrics, or quantifiable measures for the supposed consulting services to be provided to Finkel Company-1 by Consulting Company-1. It recites that invoices would be issued monthly and that Finkel Company-1 would be responsible for making payments on the monthly invoices.

f. The Finkel Contract provides that the bank to be used for payments from Finkel Company-1 to Consulting Company-1 for

services is a specific financial institution headquartered in New York, New York (Bank-1).

g. Based on documents provided by Brazilian authorities upon execution of search warrants on Consulting Company-1 and other locations, I have learned that Official-1's wife, CC-1, issued invoices to Finkel Company-1 for supposed consulting services, and that a close relative of FINKEL', CC-2, sent responsive letters and stubs on behalf of Finkel Company-1, stating in sum and substance, "We received from [Consulting Company-1] the services mentioned in the Tax Bill referred to on the side."

h. Based on my review of bank records, I know that between in or about November 2008 and in or about January 2017, Finkel Company-1 received approximately $292 million in wire transfers from Company-1 or its affiliates. Many of the incoming wire transfers referenced "SCORPIOS" and/or "SICOBE," which, as described above, are the Brazilian projects for which Company-1 and its subsidiary, Subsidiary-1, had been awarded billion-dollar contracts. Based on my participation in this investigation, and my review of documents and records, I believe that these incoming wires were sent to FINKEL, in part, to pay bribes to Official-1 through Consulting Company-1, and to other government officials responsible for steering business to Company-1 and Subsidiary-1. Several examples of these wires are described below.

i. On or about October 7, 2009, the Finkel Company-1 Account received a wire from Company-1 in the amount of $642,608.17 with the stated payment detail "COMMISSION SICOBE". On or about the same day, Finkel Company-1 Account sent $39,000 to Consulting Company-1.

ii. On or about November 4, 2009, the Finkel Company-1 Account received a wire from Company-1 in the amount of $1,194,641.30 with the payment detail "COMMISSION SICOBE". On or about November 5, 2009, the Finkel Company-1 Account sent $73,000 to Consulting Company-1.

iii. On or about December 4, 2009, the Finkel Company-1 Account received a wire from Company-1 in the amount of $2,373,789.46 with the payment detail "COMMISSION SICOBE+SCORPIOS". On or about December 7, 2009, the Finkel Company-1 Account sent $125,000 to Consulting Company-1.

iv. On or about November 8, 2010, the Finkel Company-1 Account received a wire from Company-1 in the amount of $3,867,622.06 with the payment detail "SICOBE+SCORPIOS". On or about November 9, 2010, the Finkel Company-1 Account sent $202,000

to Consulting Company-1.

v. On or about January 6, 2012, the Finkel Company-1 Account received a wire from Company-1 in the amount of $5,031,395.60 with the payment detail "Partnership 12 2011". On or about January 10, 2012, the Finkel Company-1 Account sent $310,000 to Consulting Company-1.

vi. On or about October 7, 2013, the Finkel Company-1 Account received a wire from Company-1 in the amount of $3,226,475.36 with the payment detail "Partnership 09 2013". On or about that same day, the Finkel Company-1 Account sent $182,000 to Consulting Company-1.

vii. On or about June 5, 2015, the Finkel Company-1 Account received a wire from an affiliate of Company-1 in the amount of $2,357,253.06. On or about the same day, the Finkel Company-1 Account sent $177,000 to Consulting Company-1.

i. In total, on over 70 occasions, beginning at least on or about July 9, 2009, and through at least on or about June 5, 2015, FINKEL caused Finkel Company-1 to wire transfer over $14 million from the Finkel Company-1 Account in New York to Consulting Company-1's bank account at a subsidiary of Bank-1 in Brazil.

TAX DEDUCTIONS FOR "COMMISSIONS" PAYMENTS

15. Based on my participation in this investigation and my review of bank records for Finkel Company-1, tax records for Finkel Company-1, CHARLES FINKEL, the defendant, and CC-2, foreign payment transfer records, open source documents, and documents provided by Brazilian authorities, I have learned the following:

a. Between in or about 2009 and 2017, Finkel Company-1 received in excess of approximately $292 million from Company-1 and its affiliates.

b. The U.S. federal tax returns for Finkel Company-1 for tax years 2009 through 2017 report approximately $299 million in income.

c. Between in or about 2009 and 2015, Finkel Company-1 made outgoing payments totaling approximately $102 million to three companies: Consulting Company-1 (throughout 2009-2015), and two companies incorporated in the United Kingdom ("U.K. Company-1" (2009-2010) and "U.K. Company-2" (throughout 2009-2015).

d. The U.S. federal tax returns for Finkel Company-1

for tax years 2009 through 2015 report approximately $102 million in deductible expenses identified as "commissions".

e. In the years 2011, 2012, 2013, and 2015, the amount identified as "commissions" on Finkel Company-1's other deductions schedule on its U.S. federal tax returns matches within ten cents the amount of money Finkel Company-1 sent to Consulting Company-1 and U.K. Company-2. Based on the foregoing, and my training and experience, I believe that Finkel Company-1 was deducting the approximately over $14 million paid in bribes to Consulting Company-1 as a business expense for "commissions".

f. Based on my review of Finkel Company-1's bank records, I know that the majority of the memo notes accompanying each transfer from Finkel Company-1 to U.K. Company-2 references "SICOBE", "SCORPIOS" or both. For example, on or about October 11, 2011, Finkel Company-1 transferred $1,012,220 to U.K. Company-2 with the bank memo note "DIVIDENDS SHARING FROM SICOBE AND" [sic]. Likewise, on or about October 10, 2012, Finkel Company-1 transferred $904,908 to U.K. Company-2 with the bank memo note "FROM SICOBE AND SCORPIOS BRAZIL".

/s/ sworn telephonically
Ryan Cassidy
Special Agent
Federal Bureau of Investigation

Sworn to before me this
6th day of October 2022

THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK